UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ALAN W. JENKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00591-JPH-TAB |
| | ) | |
| CENTURION HEALTH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANT CENTURION HEALTH OF INDIANA'S MOTION FOR SUMMARY JUDGMENT**

Alan Jenkins, who is incarcerated by the Indiana Department of Correction ("IDOC"), alleges in this case that the defendants denied him necessary care for his eye problems when he was incarcerated at Pendleton Correctional Facility ("PCF"). Before the Court is the motion for summary judgment filed by defendant Centurion Health of Indiana.[1] For the reasons below, that motion is **GRANTED**. Dkt. [198].

## I.
## Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to

[1] This motion was filed by defendants Centurion, Dr. John Mershon, and Lisa Hamblen, but Mr. Jenkins has since withdrawn his claims against defendants Dr. Mershon and Ms. Hamblen.

the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Mr. Jenkins did not respond to Centurion's summary judgment motion.[2] But "[e]ven where a non-movant fails to respond to a motion for summary judgment, the movant 'still [has] to show that summary judgment [is] proper

[2] Centurion sought summary ruling on its motion for summary judgment and Mr. Jenkins responded to that motion. Dkt. 201. But this filing was submitted well beyond the deadline to respond to the summary judgment motion and, as discussed below, even considering the arguments in that motion, Mr. Jenkins has not shown that Centurion is not entitled to summary judgment.

given the undisputed facts,'" *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011), with those facts taken as usual in the light most favorable to the nonmovant." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021).

Centurion also filed a motion for summary ruling on its motion for summary judgment. Dkt. 198. The Court denies that motion, but admits the facts alleged in the motion "without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts).

## II.
## Factual Background

Because Centurion has moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Khungar*, 985 F.3d at 572–73.

### A. Overview of Mr. Jenkins's Care

Mr. Jenkins began complaining of eye issues in February of 2022. Dkt. 164-1 at 1. He saw a non-party nurse on February 28, who referred him to the provider. *Id.* at 3-5. Mr. Jenkins saw optometrist Dr. Hill on March 25. *Id.* 17-20. Dr. Hill examined his eyes, tested his visual acuity, and prescribed eyeglasses. *Id.* At this visit, Dr. Hill did not document cataracts. *Id.* Mr. Jenkins received the eyeglasses on April 13. *Id.* at 21.

Dr. Hill saw Mr. Jenkins again on April 29, and Mr. Jenkins complained of pain in both eyes. *Id.* at 27. Dr. Hill submitted a consultation request to send

Mr. Jenkins to an ophthalmologist and Centurion approved the consultation on May 2. *Id.* at 24-26, 28. Mr. Jenkins saw Dr. Nisha Kheradiya at St. Vincent Medical Group on June 29. *Id.* at 35-40. Dr. Kheradiya assessed Mr. Jenkins with glaucoma, cataracts, tear film insufficiency of both eyes, and disorder of refraction. *Id.* She recommended Cosopt, a prescription eye drop solution, for the right eye and artificial tears. *Id.* She also recommended cataract surgery and a glaucoma procedure on the right eye. *Id.*

Mr. Jenkins submitted Requests for Healthcare ("RFHC") regarding his eyes on July 13, August 4, August 16, and August 22. *Id.* at 41, 46-48. He was told he would see an eye doctor and that his eyedrops were renewed. *Id.* at 48. Optometrist Dennis Lewton examined Mr. Jenkins on September 15. He noted that Mr. Jenkins's eye pressure was not controlled and submitted a request for surgery. *Id.* at 50-55. On September 27, Dr. Lewton submitted additional paperwork because the eye surgeon also needed approval from Centurion for the surgical consultation. *Id.* at 57-59. Centurion approved the ophthalmology visit on top of the eye surgery on October 3. *Id.* at 60.

Mr. Jenkins saw Dr. Elizabeth Groves at Ascension St. Vincent Medical Group on December 5. *Id.* at 61-67. Dr. Groves diagnosed him as legally blind in the left eye from an age-related cataract, recommended continuation of his current eye drops, added two new eye drops, and recommended cataract surgery. *Id.* Three days later, Dr. Lewton submitted a consultation request for approval for cataract surgery and follow-up appointments. *Id.* at 70-72. Centurion approved the request on December 14. *Id.* at 73.

On January 10, 2023, Dr. Mershon prescribed the eye drops recommended by Dr. Groves. Dkt. 161-1 ¶ 9. In response to this, Dr. Kate Wilks, Associate Statewide Medical Director for Centurion, suggested two alternative eye medications that were on the formulary and asked Jessica Love to check with the ophthalmologist if they could use those eye drops instead. Dkt. 161-5 at 8.

Dr. Groves performed cataract surgery on Mr. Jenkins on February 1. *Id.* at 10-11. When Mr. Jenkins returned to the prison after surgery, he saw a nurse and reported no complaints. *Id.* at 15. Mr. Jenkins returned to see Dr. Groves on February 2. *Id.* at 17-22. Dr. Lewton examined Mr. Jenkins on February 21 and referred him back to the ophthalmologist because he had developed tunnel vision in his right eye. *Id.* at 26-29. Centurion approved this ophthalmology follow-up visit on February 24. *Id.* at 31.

Mr. Jenkins saw Dr. Groves on March 9. *Id.* at 35-38; 48-50. She recommended an MRI and referred him to a neuro-ophthalmologist. *Id.* at 37. On March 22, Dr. Mershon requested the MRI and referral. *Id.* at 39. Centurion approved these appointments the next day. *Id.* at 47. Mr. Jenkins had an MRI of his brain and orbits on May 24. *Id.* at 58-59. The MRI suggested he had optic neuropathy. *Id.*

Mr. Jenkins submitted an RFHC on August 14, asking about his neuro-ophthalmology appointment and was told that it was scheduled. *Id.* at 68. On October 23, Mr. Jenkins submitted an RFHC that he was recently taken to IU to the neuro-ophthalmologist but the appointment was cancelled and he wanted

something for his pain in his head. *Id.* at 74. In response, Nurse Practitioner Christine Nudi examined him on November 3. She noted that he had taken Tylenol and ibuprofen without relief and prescribed headache medication. *Id.* at 75; dkt. 161-6 at 1-2.

Mr. Jenkins went to IU to see the neuro-ophthalmologist, Dr. Devin Mackay, on December 28. *Id.* at 42-49. Dr. Mackay concluded that Mr. Jenkins had suffered nerve damage following his cataract surgery and that he was at risk for the same complication if he had surgery on his other cataract, so he recommended against further surgery. *Id.* at 19. The specialist recommended updated eyeglasses to help his vision. *Id.*

Mr. Jenkins saw optometrist Dr. Joseph LaPlaca, on February 19, 2024. *Id.* at 26-28, 30. Dr. LaPlaca noted that Mr. Jenkins was currently on glaucoma medications and that he had suffered nerve damage following his cataract surgery. *Id.* at 26. He referred Mr. Jenkins back to an ophthalmologist. *Id.* at 21-25. Centurion approved this referral on February 22. *Id.* at 29. Mr. Jenkins returned to the ophthalmologist at St. Vincent on March 15. Dkt. 161-6 at 36. The ophthalmologist changed his medications and told him to return in 6 months. *Id.* On March 27, NP Mabandla referred him for his 6-month follow-up with the ophthalmologist. *Id.* at 7-9. Mr. Jenkins submitted an RFHC on April 8, to see the prison eye doctor and in response he was put on the schedule. *Id.* at 10. Mr. Jenkins saw Dr. LaPlaca on April 24. *Id.* at 12, 22-24. Dr. LaPlaca referred him back to the ophthalmologist. *Id.*

**B. Centurion**

Centurion provides medical, dental, mental health, and optometry care at Pendleton. Dkt. 161-2 ¶ 13. When inmates need hospital or specialty care that cannot be provided at the prison, Centurion uses providers in the community for these services. *Id.* Scheduling assistant Jessica Love locates a local provider willing to see the provider and then schedules the appointment. *Id.* ¶ 14. Centurion does not control when the appointment is scheduled. *Id.*

Mr. Jenkins contends that Centurion has a policy, practice, or custom of denying or delaying care to save money. Former defendants Dr. John Mershon and Lisa Hamblen affirm that they are not aware of a policy or practice of denying care to save cost. Dkt. 161-1 ¶ 12; dkt. 161-2 ¶ 23. The care provided is based on the clinical judgment of the providers. Dkt. 161-1 ¶ 12.

## III.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).

Private corporations acting under color of state law—including those that contract with the state to provide essential services to prisoners—are treated as municipalities for purposes of Section 1983 and can be sued when their actions violate the Constitution. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). To

support a *Monell* claim, Mr. Jenkins must identify an action taken by the municipality and allege a causal link between the municipality's action and the deprivation of federal rights. *Dean,* 18 F.4th at 235. "A municipality 'acts' through its written policies, widespread practices or customs, and the acts of a final decisionmaker." *Levy v. Marion Co. Sheriff*, 940 F.3d 1002, 1010 (7th Cir. 2019).

"Liability under this standard is difficult to establish, requiring a § 1983 plaintiff to prove that a municipality, either through an express policy or an implied policy of inaction, took deliberate action that was the moving force behind a constitutional injury." *Taylor v. Hughes*, 26 F. 4th 419, 435 (7th Cir. 2022) (cleaned up). Liability may attach in two circumstances: First, "if an express municipal policy or affirmative municipal action is itself unconstitutional, . . . a plaintiff has a straightforward path to holding the municipality accountable . . . [and] a single instance of a constitutional violation caused by the policy suffices to establish municipal liability." *Id.* (cleaned up). Second, a plaintiff may show "gaps in express policies or . . . widespread practices that are not tethered to a particular written policy—situations in which a municipality has knowingly acquiesced in an unconstitutional result of what its express policies have left unsaid." *Id.* (cleaned up). Under this theory, a plaintiff "must typically point to evidence of a prior pattern of similar constitutional violations" to "ensure that there is a true municipal policy at issue, not a random event." *Id.* (cleaned up).

Centurion argues that Mr. Jenkins has designated no evidence to allow a reasonable jury to find that a policy, practice, or custom attributable to Centurion caused a constitutional deprivation. Mr. Jenkins did not timely respond to Centurion's motion for summary judgment and therefore did not designate evidence to allow a conclusion that any alleged delay or denial of treatment resulted from a Centurion policy, practice, or custom. In addition, even considering Mr. Jenkins's assertion in his deposition that Dr. Hill told him that Centurion would not pay for his cataract surgery as designated evidence, this is not enough to allow a conclusion that a Centurion policy, practice, or custom caused a violation of Mr. Jenkins's rights. Instead, the designated evidence reflects that Centurion approved several consultations for his eye issues, including cataract surgery. Dkt. 161-4 at 27, 55, 60, 73; dkt. 161-5 at 10-11, 31, 47, 68; dkt. 161-6 at 29. In addition, Mr. Jenkins has not designated specific evidence to dispute Centurion's evidence that, when Ms. Love schedules outside appointments, it has no control over the timing of those appointments. Dkt. 161-2 ¶ 14.

Finally, in response to Centurion's motion for summary ruling, Mr. Jenkins does not directly confront Centurion's evidence and argument. He does contend that Centurion is liable for the acts of Ms. Hamblen, Dr. Mershon, and the other defendants. Even considering this argument as if it were part of a timely-filed response to the motion for summary judgment, Centurion is still entitled to summary judgment because private corporations are not vicariously liable for the acts of their employees under § 1983. *Jackson v. Illinois Medi-Car,*

*Inc.*, 300 F.3d 760, 766 (7th Cir. 2002) (quoting *Iskander v. Vill. of Forest Park,* 690 F.2d 126, 128 (7th Cir. 1982)).

Because no reasonable jury could conclude that Centurion had a policy, practice, or custom that caused a delay or denial of Mr. Jenkins' treatment, Centurion is entitled to summary judgment.

## IV.
## Conclusion

Centurion's motion for summary ruling on the motion for summary judgment, dkt. [198], is **denied**. Its motion for summary judgment, dkt. [161], is **granted**. The **clerk shall terminate** Centurion as a defendant. No partial final judgment shall issue as to the claims resolved in this Order.

**SO ORDERED.**

Date: 11/6/2026

James Patrick Hanlon

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

ALAN W. JENKINS
870097
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel